JOSEPH R. FEENEY, administrator, *vs.* NEW ENGLAND MEDICAL CENTER, INC., & others. No. 92-P-599. June 28, 1993. *Medical Malpractice*, Complaint, Tribunal. *Negligence*, Medical malpractice.

The plaintiff administrator, alleging that the death of his decedent son was caused by medical malpractice, commenced this action against the emergency room physician (Dr. Edward Deutsch), the nurse on duty ("Jane Doe"), and the hospital (New England Medical Center, Inc.). A medical tribunal convened under G. L. c. 231, § 60B, found the plaintiff's offer of proof insufficient. As the plaintiff was unable to provide the statutory bond, even as reduced in amount,[1] judgment entered against him dismissing his complaint. He appeals. (1) We hold that the tribunal erred; accordingly, we reverse the judgment and reinstate the complaint. (2) Further, the plaintiff is entitled to leave to amend his complaint to substitute the true name of the duty nurse, Stephen M. Downs, R.N., for "Jane Doe" as a party defendant.

---

[1]The plaintiff has complained of the amount and other features of the statutory bond required of him, but this phase of his appeal falls away because we hold that the plaintiff's offer of proof was adequate and no bond can be required.

1. Here is a summary of the substance of the offer of proof. At 10:16 P.M., December 1, 1987, an ambulance team of the Boston department of health and hospitals found Brian R. Feeney, twenty-six years old, manifestly very drunk, sitting in the open on a street corner in South Boston. Feeney admitted to alcohol abuse but denied drug use. He was physically and verbally combative and had trouble walking and speaking intelligibly. His condition interfered with the team's conducting an examination of him. Vital signs were not taken. He was picked up by ambulance and arrived at the hospital at 10:45.

No observer could doubt that the patient had taken deeply of ethanol. (The autopsy report in fact revealed an ETOH blood level of 0.39%, a very dangerous condition.) Even on the basis of the patient's outward appearance and behavior, a professional, physician or nurse, could readily recognize grave risk to the patient through depression of the respiratory system: "in the short run, the systemic effects [of the ingestion of ethanol] with the potential for the greatest negative outcome involves depression of the respiratory system" (McGoey).[2]

At 10:45, as the patient was received at the hospital, he was judged responsive to pain, and able to speak and move his extremities. There was "no apparent trauma." However, there is no record that vital signs were taken, which should have comprised pulse or respiratory rate (Benjamin). The patient was placed on his side on a stretcher "in bypass" location.

The documentation for the period between 10:45 and 11:30 is "sparse and contradictory," as one of the experts put it (McGoey). On the "Emergency Record" the next entry after 10:45 is at 11:30 when the patient was brought to the examining room: he was then without respirations, cyanotic, pupils fixed and dilated. On the "Physician Documentation Record," in which the emergency room physician wrote out the course of the case to the end, he reported (at second hand) that a nurse returned twenty minutes after 10:45 and found the patient unresponsive and without respirations. But this record goes on to report that the patient was pronounced dead at 12:07 A.M. after about thirty minutes of "code." If (referring to the Emergency Record) the nurse returned to the patient at 11:30, then, inferentially, the patient had not been monitored for forty-five minutes. On the other hand, if (referring to the Physician Documentation Record) the patient was seen at 11:05, there is room for the inference that a lapse of twenty-five minutes intervened between that visit and the commencement of "code." An expert suggested that the former was the "more probable scenario" (McGoey). On either basis a gap appears needing explanation.

---

[2]Parenthetical references are to the experts whose opinions were tendered in the offer of proof: Mary Jane McGoey, R.N., M.S., director of quality assurance and risk management at Children's Hospital, Boston; Jonathan M. Alexander, M.D., specialist in emergency room management; David M. Benjamin, Ph.D., clinical pharmacologist. The qualifications of these experts in their specialities are unquestioned for the present purpose.

The minimum standard of care on the nursing side called for monitoring the respiratory rate of this patient every fifteen minutes; this "would more likely have permitted the nursing staff to observe changes in this patient's breathing patterns and/or the onset of respiratory arrest" (McGoey). Regarding the standard for the emergency room physician: "Failure of physician to evaluate the patient within the first few minutes of Mr. Feeney's entry into the emergency facility and to initiate care. Even absent any nursing-initiated contact of Dr. Deutsch, the emergency physician has an obligation to determine who is waiting for physician care and how critical is the need for that care" (Alexander). Had the standards been maintained, respiratory arrest might have been averted or overcome (Alexander, McGoey). According to the autopsy report, respiratory arrest was the sole cause of death.

The failure, as suggested, to provide adequate care could be rationally attributed by a trier to the staff nurse assigned to the area in which the patient lay, as well as to the physician in charge (Alexander, McGoey). The hospital is implicated on the basis of the acts or omission of staff.

Reviewing the offer of proof, we conclude that it presents a case which, if substantiated, would withstand a motion for a directed verdict. See *Kulas* v. *Weeber*, 20 Mass. App. Ct. 983 (1985), and cases cited. This, of course, is by no means to say that the plaintiff is bound to succeed at trial.

The tribunal may have taken an early wrong turn in its analysis. During the short tribunal hearing, the physician-member questioned whether the patient was in a waiting room outside the emergency treatment area proper. He took this as bearing on the issue whether a doctor-patient relationship was established. At a later hearing before the judge on a collateral matter, the judge mentioned the same point. The plaintiff reads "in by-pass" as probably meaning a hallway between the waiting and emergency treatment room or area. The location and environs may be further clarified by the time of trial. Quite apart from the location of the stretcher, a doctor-patient relationship is supported by the history of the case starting at 10:45 P.M. and continued. Also sufficiently shown for the present purpose, were negligence and causality, to complete the triad. See *Kapp* v. *Ballantine*, 380 Mass. 186, 193 (1980).

2. The defendant "Jane Doe" was dismissed under Superior Court Standing Order 1.88(E)(i)(1), as amended (1990), because not served within ninety days following the filing of the complaint. After deposition-taking, the plaintiff ascertained that Downs was the nurse with most responsibility for this patient's care. Accordingly, the plaintiff moved for relief from the formal dismissal and for leave to amend his complaint to replace "Jane Doe" by Downs as a defendant. The judge's denial of the motions was not explained and was mistaken.

The judgment appealed from is reversed and the complaint is reinstated. The plaintiff has leave to amend the complaint as indicated.

*So ordered.*

*Steven B. Rosenthal* for the plaintiff.
*Martha A. Driscoll* for the defendants.